# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-SA-00253-SCT

*HATTIESBURG MEDICAL PARK
MANAGEMENT CORP., BEDFORD CARE
CENTER OF MENDENHALL, LLC, BEDFORD
CARE CENTER MONROE HALL, LLC, BEDFORD
ALZHEIMER'S CARE CENTER, LLC, BEDFORD
CARE CENTER OF NEWTON, LLC, BEDFORD
CARE CENTER OF PETAL, LLC, BEDFORD
CARE CENTER OF HATTIESBURG, LLC AND
BEDFORD CARE CENTER OF MARION, LLC*

*v.*

*MISSISSIPPI DIVISION OF MEDICAID AND
CINDY BRADSHAW, IN HER OFFICIAL
CAPACITY AS EXECUTIVE DIRECTOR OF
MISSISSIPPI DIVISION OF MEDICAID*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/21/2024 |
| TRIAL JUDGE: | HON. TIFFANY PIAZZA GROVE |
| TRIAL COURT ATTORNEYS: | S. MARK WANN |
| | JANET McMURTRAY |
| | KRISTEN SHEPPARD JONES |
| | MAUREEN BURKE SPEYERER |
| | ELLIOTT VAUN HALLER |
| | ABBIE EASON KOONCE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | S. MARK WANN |
| | CHARLES HENRY BEST, III |
| ATTORNEYS FOR APPELLEES: | JANET McMURTRAY |
| | MAUREEN BURKE SPEYERER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 11/20/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     Hattiesburg Medical Park Management Corp., Bedford Care Center of Mendenhall, LLC, Bedford Care Center Monroe Hall, LLC, Bedford Alzheimer's Care Center, LLC, Bedford Care Center of Newton, LLC, Bedford Care Center of Petal, LLC, Bedford Care Center of Hattiesburg, LLC and Bedford Care Center of Marion, LLC[1] (the Providers), appeal the chancellor's decision to affirm adjustments made by the Division of Medicaid (DOM) to the 2015 cost reports filed by the Providers.  We find DOM's change to its long-standing internal policy without public notice was arbitrary and capricious; therefore, we reverse the decisions of the DOM and the chancellor and render judgment in favor of the Providers.

**FACTS AND PROCEDURAL HISTORY**

¶2.     "Medicaid is a federal and state program created to provide medical assistance to eligible, low income populations."  https://www.medicaid.ms.gov/medicaid-coverage (last visited Sept. 15, 2025).  In Mississippi, the Medicaid program is administered by DOM, which is a division of the Office of the Governor.  Miss. Code Ann. §§ 43-13-103, -107 (Rev. 2023).  The Providers accept payments from DOM for services provided to Medicaid recipients.

¶3.     This case involves adjustments made by DOM after an audit of the 2015 cost reports

---

[1] Bedford Care Center of Mendenhall, LLC, Bedford Care Center Monroe Hall, LLC, Bedford Alzheimer's Care Center, LLC, Bedford Care Center of Newton, LLC, Bedford Care Center of Petal, LLC, Bedford Care Center of Hattiesburg, LLC, and Bedford Care Center of Marion, LLC, are long-term-care providers. Hattiesburg Medical Park Management Corp. is their associated home office.

2

filed by the Providers. The adjustments relate to payments[2] received by the Providers from three different insurance companies—Mississippi Health Care Association Self-Insurers' Fund (MHCA-SIF), Caregivers United Liability Insurance Co. (CULIC), and Long Term Care Employers Insurance Co. (LTCEIC).[3]

¶4. For many years, the Providers listed the dividends received from the three insurance companies as "other income" on their cost reports using the companies' acronyms, and the Providers did not offset the dividends against insurance costs.

¶5. In 2016, the Providers each filed their 2015 cost report with DOM. As they had previously done for many years, the Providers reported the dividends as "other income" on their 2015 cost reports and noted that the dividends were not offsetable because they pertained to a prior year and were therefore "out of period adjustments." DOM failed to flag the "other income" during its desk review. DOM approved the 2015 cost reports, which set the 2017 payment rates for the Providers.

¶6. Around 2018, DOM began an audit of the 2015 cost reports. During the audit, DOM discovered that the "other income" listed by the Providers was from insurance companies. DOM made adjustments based on the audit. The adjustments included, among other things, the decision to offset the dividends received by the Providers from their insurers against costs

---

[2] The Providers refer to the payments as dividends. DOM refers to the payments as rebates. The chancellor referred to the payments as insurance payments. For clarity and consistency, we refer to the payments as dividends.

[3] MHCA-SIF provides workers' compensation insurance, CULIC provides professional- and general-liability insurance, and LTCEIC provides excess-insurance coverage to MHCA-SIF and CULIC.

of insurance in the year the dividends were received. This adjustment affected the Providers' rates that had been paid for 2017 under Mississippi's prospective-payment system.[4]

¶7. The Providers asked DOM to reconsider some of the adjustments it made, including the offset for the dividends. DOM reviewed the challenged adjustments and, by letter, reversed some adjustments but upheld others, including the adjustments related to the dividends. The Providers requested an administrative appeal, which was granted.

¶8. At the administrative hearing, the Providers argued that DOM had a long-standing internal policy not to offset the dividends and should be held to that policy, that public notice was required to change the policy, and that offsetting income from multiple years in one year is poor policy for a prospective-payment system and does not support the goals of the State Plan.[5] DOM, on the other hand, argued that the State Plan applies and that the State Plan requires that the dividends be offset against the insurance costs in the year the dividends were received by the Providers.

---

[4] The Providers explained the prospective payment system as follows:

> Mississippi's State Plan adopts a prospective payment system whereby the 2015 cost reports being audited here will establish reimbursement rates for the year 2017. The prospective payment system does not reimburse actual costs. Instead[,] the allowable costs from one year are used to determine the rate that will be paid two years down the road. None of the dividends at issue are guaranteed to be paid every year in the future. So if the rate paid in 2017 is reduced because of a dividend received in 2015, and then the same dividend is not paid in 2017, then the 2017 rate will be inadequate to meet expenses.

[5] "The Mississippi Medicaid State Plan (State Plan) is a detailed agreement between the State of Mississippi and the Federal Government that describes the nature and scope of Mississippi's Medicaid Program. . . . Changes to the State Plan . . . must be approved by the Centers for Medicare and Medicaid Services (CMS)." https://www.medicaid.ms.gov/about/state-plan (last visited Sept. 15, 2025).

¶9.   The hearing officer found that the adjustments made by DOM as a result of the audit were supported by substantial evidence, were not arbitrary or capricious, and were within DOM's power to make and that DOM did not violate a statutory or constitutional right of the Providers.  The hearing officer recommended that the adjustments be affirmed.

¶10.   DOM's executive director adopted the hearing officer's recommendation and upheld DOM's decision to adjust the 2015 cost reports to offset the dividends received by the Providers from their insurers against insurance costs in the year the dividends were received. The Providers timely appealed to the chancery court.

¶11.   The chancellor found as follows:

> State Plan 419-D, Ch2, §2-1 states that allowable costs are based on "PRM 15-1 standards except as otherwise described in this plan." The State Plan does not specifically address how a Provider should account for insurance payments like those at issue in this matter. Therefore, according to the State Plan, DOM and Providers must look to PRM 15-1.[6]
>
> . . . .
>
> . . . [D]espite the type of insurance, the regulations are clear that any withdrawal from the funds for any purpose other than premiums, claims, losses or expenses, must be offset against "allowable contribution." Similarly, income used for any other purpose must be used to offset against allowable payments. Simply put, withdrawals must be offset against premiums and income, whether characterized as dividends or incentive payments, must be used to offset those premiums.
>
> Finding no specific guidance in the State Plan, DOM properly utilized the PRM 15-1 to determine the appropriate manner of treatment for the insurance payments received by Providers in this matter. As the same is based upon the specific governing regulations of DOM, the actions taken are clearly within its statutory authority. Likewise, the decisions and determinations are

---

[6] The Provider Reimbursement Manual (PRM) is published by CMS and establishes the policies and guidelines for calculating and paying Medicare providers.

based upon substantial evidence and are neither arbitrary nor capricious.

¶12. As to the Providers' assertion of an internal policy, the chancellor found that "[n]o written documentation of such policy was submitted . . . [nor was] corroborating testimony to establish the same." Regarding notice, the chancellor found that

> DOM complied with the requirements of PRM 15-1, so notice [wa]s not required. . . . DOM explained that the offsetting of the insurance payments was required by PRM 15-1. DOM further explained that it was unaware of the asserted unwritten internal policy and that, if such policy existed, it was improper and a mistake of law.

The chancellor concluded that the Providers did not meet their burden of proof, and she affirmed DOM's decision.

¶13. The Providers now appeal and argue (1) DOM's actions were arbitrary and capricious, (2) DOM must provide public notice of its policy change, (3) DOM is equitably estopped from reversing its long-standing policy, and (4) DOM's offset of the LTCEIC dividends is unfounded.

## STANDARD OF REVIEW

¶14. We have explained our standard of review as follows:

> In all cases in which we review a chancellor's opinion concerning a DOM hearing officer's decision, we must decide "whether the order of the agency 1) was supported by substantial evidence, 2) was arbitrary or capricious, 3) was beyond the power of the agency to make, or 4) violated some statutory or constitutional right of the complaining party." *Adams v. Miss. State Oil & Gas Bd.*, 139 So. 3d 58, 62 (Miss. 2014) (internal quotation mark omitted) (quoting *Anadarko Petroleum Corp. v. State Oil & Gas Bd. of Miss.*, 99 So. 3d 109, 111 (Miss. 2012)).

> This Court has stated that arbitrary means "fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; [it is] not done according to reason or judgment . . . ."

6

*Harrison Cty. Bd. of Supervisors v. Carlo Corp.*, 833 So. 2d 582, 583 (Miss. 2002) (quoting *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 322 (Miss. 1992)). We have also defined capricious to mean "freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of a disregard for the surrounding facts and settled controlling principles . . . ." *Id.* (quoting *McGowan*, 604 So. 2d at 322).

*Cent. Miss. Med. Ctr. v. Miss. Div. of Medicaid*, 294 So. 3d 1121, 1125 (Miss. 2020) (alterations in original), *overruled on other grounds by Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 319 So. 3d 1049 (Miss. 2021). "This Court reviews agency interpretations of statutes, rules, and regulations de novo." *Wilkinson Cnty. Senior Care, LLC v. Miss. Div. of Medicaid*, 341 So. 3d 932, 938 (Miss. 2022) (citing *Miss. Methodist Hosp. & Rehab. Ctr.*, 319 So. 3d at 1054-55).

## DISCUSSION

### I. *DOM's decision was arbitrary and capricious.*

¶15. The Providers argue that DOM's decision "to offset dividend payments to the Providers from MHCA-SIF, CULIC, and LTCEIC after decades of not offsetting the same payments was arbitrary and capricious" and that "DOM's abrupt change in course without notice to the Providers was done without a reasonable explanation." We agree.

¶16. At the administrative hearing, the Providers offered numerous witnesses, all of whom testified regarding DOM's long-standing treatment of the dividends. Those witnesses included Jamie Collier, Stephen Worrel, Leon Lebreton, and Harry Strohm.

### A. *Jamie Collier*

¶17. Collier was employed at DOM from 1983 to 2001. Collier began her employment at

DOM as the Medicaid financial-program coordinator. She became DOM's director of reimbursement in the late 1980s or early 1990s and remained in that position until she left in 2001.[7] Collier was accepted by the hearing officer as an expert in the areas of Medicaid policy, procedure, and reimbursements, specifically as it applies to long-term-care facilities, cost reports, and audits. Collier testified in relevant part as follows:

[Providers' Counsel]:    And what did you do with the payments on the cost reports?

[Collier]:    Well, I remember having a meeting with my staff first to determine what we were going to do because during cost report season we had weekly meetings to talk about issues that anybody had come across because different people did desk reviews

As part of the desk review procedure, . . . one thing we looked at was miscellaneous income to see if offsets were made for things that should have been offset. And so we—when we noticed the refunds from the [MHCA-]SIF—that's all that was there when I worked there—we talked about if it should be offset or not. And we made the decision that it should not be offset for a couple of reasons.

First of all, a facility is not allowed—if they have an expense from a prior year that's paid in a future year, they are not allowed to put that on their cost report. So we applied the same principal to that.

But the main thing is that, when we redid our payment system in the '90s, we wanted to have a system that was fair to the providers,

---

[7] Collier went to work in private practice preparing cost reports for nursing-home companies.

especially those—we redid the plan for people who have an incentive to take heavy care patients, put the money for patient care.

And we felt like if we—if we offset it, we would reward the facilities who had a bad experience rating and did not get a refund. So, therefore, their full premium would be allowable on the cost report and would go into their rate, where those who were a good performing facility and had a low loss rate, they got a refund. And if we offset it, it would decrease their cost, their allowable cost, on the cost report and would decrease their rate.

And we didn't want to give an incentive to do a poor job as far as Workers' Comp claims in the facility. So that was the main reason why we decided not to offset it.

And it became like an internal policy. I regret that we didn't put it in the State Plan or in the cost report instructions.

But we continued with that policy until I left in 2001, and it continued after that because I prepared cost reports for long after that, and it was never offset on any cost report I ever did.

[Providers' Counsel]: And you spoke about meeting with DOM staff about this issue. Would . . . this have ever come up in training, or anything like that, with the facilities themselves?

[Collier]: Well, we did cost report training periodically. . . . We would . . . have a workshop and go over the cost report and how to do it. I don't remember specifically what was in our training. But another thing is that, when a provider receives their desk review, they're supposed to share it with their preparer, and they can learn from it to see what adjustments were made on the cost report so they

9

can do it correctly the next year. So that's our way of training, in two ways.

. . . .

[Providers' Counsel]: In your opinion, did the treatment of those payments set precedent?

[Collier]: Yes.

[Providers' Counsel]: And if there were such precedent, would that require any kind of notice to change the precedent?

[Collier]: I think so.

. . . .

[Providers' Counsel]: In your opinion, is the change in treatment of these payments a significant change in Medicaid methods and standards for setting payment rates for services?

[Collier]: Yes[.]

[Providers' Counsel]: Could you explain why it is such a significant change?

[Collier]: Well, it impacts the rates of the providers. It could be significant based on the refund that they receive. And it's—I mean, it's a policy that's been in effect for over 20 years. And I think any time you make a change like that you're better off to work with the providers than against the providers.

. . . .

[DOM's Counsel]: [Y]ou didn't bring the State Plan that was in effect in 2001 with you today, did you?

[Collier]: No, I did not.

10

. . . .

[DOM's Counsel]:    So when you retired in 2019, you were using the State Plan that was in effect in 2019, weren't you?

[Collier]:    Yes. But when I was doing the 2015 cost reports, I was using the one for 2015.

. . . .

[DOM's Counsel]:    For the year 2001[,] there was a different State Plan than the State Plan that we're here today about?

[Collier]:    Yes.

[DOM's Counsel]:    So what we were talking about in 2001 when you were talking to your staff is not the same State Plan that we are here today about?

[Collier]:    I think the wording is the same for the issue that we're talking about today.

. . . .

[DOM's Counsel]:    Now, when you talked to your staff, you made a policy decision that you thought that you shouldn't make an offset. That's what you testified to?

[Collier]:    Yes.

[DOM's Counsel]:    Policy decisions have to be written down, don't they?

[Collier]:    Well, in retrospect I should have written it down. . . . But, apparently, the policy continued if they didn't start making offsets until now.

. . . .

[DOM's Counsel]:    Medicaid speaks through its State Plan, doesn't

11

it?

[Collier]: Yes, it does.

[DOM's Counsel]: And CMS approves policy through its State Plan, doesn't it?

[Collier]: Yes, it does. But we also had the cost report instructions, which were not part of the State Plan. That was a policy. So there are other policies that Medicaid has that aren't necessarily part of the State Plan.

. . . .

[DOM's Counsel]: Well, the PRMs are specific, aren't they?

[Collier]: Yes.

[DOM's Counsel]: And they say [the dividends] should be offset?

[Collier]: Well, if Medicaid policy is different, it's not [offset].[8]

[DOM's Counsel]: [B]ut Medicaid policy doesn't say . . . that you should not offset these, does it?

[Collier]: Our internal policy said that.

[DOM's Counsel]: Your internal policy isn't the State Plan, is it?

[Collier]: And when we trained providers and preparers, they were instructed that it would not be offset.

[DOM's Counsel]: You may have done that. I don't know. But that's the point. An oral conversation can't make policy, can it?

---

[8] Under Attachment 4.19-D, Chapter 2, Section 2-1 of the State Plan, "[i]n cases where Division of Medicaid cost reporting rules conflict with . . . PRM 15-1, Division of Medicaid rules take precedence for Medicaid provider cost reporting purposes."

| [Collier]: | But Medicaid for years did desk reviews, and they did not offset it. So that to me is a way that they're publishing their policy that this is the way it is supposed to be done. Because I know[,] I follow cost reports. We have refunds, and they were never offset. |
|---|---|
| [DOM's Counsel]: | Ms. Collier, you're sophisticated, and you worked for Medicaid, and then you went to the private sector where you file cost reports. You, as a provider, understand that providers have to follow the State Plan and written policy, don't you? |
| [Collier]: | Okay. But part of that was every year when I got my desk reviews, I would look at them as I was preparing the next year's to see if they made any different type of adjustments. If they're not offsetting it, I'm not going to offset it on my cost report. |
| [DOM's Counsel]: | [I]f the IRS doesn't catch you doing something and you get away with it for years, good for you. If Medicaid didn't catch you doing something and you got to keep money, good for you. But when they catch you— |
| [Collier]: | . . . [T]he IRS—I don't think when I file my personal tax return that they look at every tax return. Medicaid did a desk review of every cost report that came in. And one thing that they specifically looked at was miscellaneous income. And we would put on there it was a refund for a prior year, no offset required. We spelled it out, and it was never adjusted. |

### B. Stephen Worrel

¶18. Worrel is the chief financial officer at Hattiesburg Medical Park Management Corporation, a management company that provides management and accounting services to the Bedford Care Centers. The Bedford Care Centers are a group of nursing facilities that

include the Appellants. Worrel prepared the cost reports for the nursing facilities and testified in relevant part as follows:

| | |
|---|---|
| [Providers' Counsel]: | [D]id you prepare the . . . 2015 cost reports at issue today? |
| [Worrel]: | I did. |
| . . . . | |
| [Providers' Counsel]: | Are you a certified public accountant? |
| [Worrel]: | Yes. |
| [Providers' Counsel]: | How long have you been involved in the preparation of cost reports for the Bedford Care facilities? |
| [Worrel]: | [S]ince 1981. |
| . . . . | |
| [Providers' Counsel]: | And did one or more of those facilities receive dividends from [MHCA-]SIF when they first started paying them in 1993? |
| [Worrel]: | Yes. |
| [Providers' Counsel]: | And at any point from that time until today did you ever, in preparing the cost report, offset those dividends against current expenses? |
| [Worrel]: | No. |
| . . . . | |
| [Providers' Counsel]: | At any time from 1993 until . . . 2018—that's a period of 25 years—did Medicaid ever raise your failure to offset those dividends as an issue in a desk review. |

| | |
|---|---|
| [Worrel]: | No. |
| [Providers' Counsel]: | Did they ever raise it as an issue in a cost report? |
| [Worrel]: | No. |
| [Providers' Counsel]: | Did they ever raise it as an issue in any way that you're familiar with? |
| [Worrel]: | Never. |
| [Providers' Counsel]: | Did you ever receive any instructions that Medicaid put out that directed you to start offsetting those dividends? |
| [Worrel]: | No. |
| [Providers' Counsel]: | So the first you learned of the fact that Medicaid was going to start requiring you to offset those dividends was when you got your proposed adjustments with regard to the 2015 audit? |
| [Worrel]: | That's correct. |
| . . . . | |
| [Providers' Counsel]: | So there are things you might have done differently had you had notice of this change in position? |
| [Worrel]: | Yes. |
| . . . . | |
| [DOM's Counsel]: | I have no questions. |

### C.     Leon Lebreton

¶19.   Lebreton is the founder, owner, and chief executive officer of the Lancaster Group, a company that provides third-party reimbursement consulting services to long-term-care

facilities, specialty hospitals, and home health and hospice agencies.  Lebreton, who is a certified public accountant, was accepted by the hearing officer as an expert in healthcare accounting and Medicare/Medicaid reimbursement principles.  He testified in relevant part as follows:

| [Providers' Counsel]: | [D]o you have experience in Medicaid reimbursement issues? |
|---|---|
| [Lebreton]: | Yes. |
| [Providers' Counsel]: | And do you have experience preparing cost reports for long-term care facilities? |
| [Lebreton]: | Yes. |
| [Providers' Counsel]: | Do you prepare cost reports for long-term care facilities in Mississippi? |
| [Lebreton]: | Yes. |
| . . . . | |
| [Providers' Counsel]: | I'm not asking you anything about your opinion whether or not Division of Medicaid in Mississippi had a policy before these audits arose about payment or offset of dividends. So I know that's not an issue you have any personal knowledge of. However, I am going to ask you if . . . Mississippi Medicaid did have a policy that these dividends in question would not be offset and then decided that they would start requiring facilities to offset those policies, if that was the case, would you consider that a significant change in Medicaid's methods and standards for setting payment rates for services? |
| [Lebreton]: | Yes, I would. |
| [Providers' Counsel]: | Okay. So in your opinion a public notice would be |

|                        |                                                                                 |
|------------------------|---------------------------------------------------------------------------------|
|                        | required for that change?                                                       |
| [Lebreton]:            | Among other things, yes.                                                        |
| [Providers' Counsel]:  | What other things?                                                              |
| [Lebreton]:            | Request for approval from CMS probably by way of State Plan amendment.          |

. . . .

| [Providers' Counsel]: | And did you prepare cost reports for facilities in Mississippi any time between 1993 and 2018? |
|-----------------------|-----------------------------------------------------------------------------------------------|
| [Lebreton]:           | Maybe 2018. . . . I'm thinking '16, '17, '18, somewhere around there.                          |
| [Providers' Counsel]: | Okay. Do you remember if those Mississippi facilities received dividends from any of these three [insurance] entities? |
| [Lebreton]:           | Yes.                                                                                           |
| [Providers' Counsel]: | And did you offset those dividends against current expenses?                                   |
| [Lebreton]:           | No.                                                                                            |
| [Providers' Counsel]: | Why not?                                                                                       |
| [Lebreton]:           | Because they were based on . . . experiences from prior years[.]                              |

. . . .

| [DOM's Counsel]: | [Regarding] payments to these providers from the insurance entities, they have to use those payments to reduce their costs. You would agree with me? |
|------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------|
| [Lebreton]:      | In the Medicare context I would agree with you. In [the Medicaid] context[,] I would disagree with                                                   |

17

you.

>        D.        *Harry Strohm*

¶20.    Strohm, a certified public accountant, has been doing reimbursement and cost-report work since 1971. He performed audits for DOM and also reviewed desk reviews for DOM. Strohm was accepted by the hearing officer as an expert in Medicaid policy, procedure, and reimbursement, specifically as it applies to long-term-care facilities, cost reports, and audits. Strohm testified in relevant part as follows:

| [Providers' Counsel]: | [A]re you familiar with the [MHCA]-SIF, CULIC, and LTCEIC that we discussed today? |
|---|---|
| [Strohm]: | Yeah. |
| [Providers' Counsel]: | And are you aware that they make payments to some of these facilities sometimes? |
| [Strohm]: | Right. |

. . . .

| [Providers' Counsel]: | [B]ased on your experience, are you aware of how the Division of Medicaid has historically treated these payments? |
|---|---|
| [Strohm]: | Yes. |

. . . .

| [Providers' Counsel]: | [D]id they require them to be offset in your experience? |
|---|---|
| [Strohm]: | No. |

. . . .

| [Providers' Counsel]: | [Y]ou said you were doing work on audits for |

DOM.

[Strohm]: Yes.

[Providers' Counsel]: And not requiring this offset?

[Strohm]: Right.

. . . .

[Providers' Counsel]: [Y]ou've covered the 1990s until today?

[Strohm]: 1990s and all.

[Providers' Counsel]: And from the 1990s until around when this audit was done 2018, you weren't aware of DOM requiring these dividends to be offset?

[Strohm]: I was aware that [DOM] didn't want us to offset them, that [DOM] told us we shouldn't offset it.

. . . .

[Providers' Counsel]: Now, Mr. Strohm, in your opinion, is the change in the treatment of these payments a significant change in Medicaid methods and standards for setting payment rates for services?

[Strohm]: Yes.

[Providers' Counsel]: And if it is a significant change, does Medicaid need to provide notice?

[Strohm]: Yes.

[Providers' Counsel]: Prior to 2018, 2019, when the audits we're talking about today, were you given any notice of this change?

[Strohm]: No.

[Providers' Counsel]: And you're working with DOM reimbursement

19

matters every day through this period, and you did not receive any notice?

[Strohm]:                No.

[Providers' Counsel]:    You didn't receive a notice saying that you needed to start offsetting these payments?

[Strohm]:                No.

[Providers' Counsel]:    If your clients or the providers or someone were to be given notice of this change in policy, would that change how they operate?

[Strohm]:                Yes.

[Providers' Counsel]:    And as somebody that does cost reports in Mississippi, is it important for the providers and facilities to know the rules so that they can make projections going forward?

[Strohm]:                Yes. If we don't know the rules, we're just at the mercy of anybody to make a decision.

. . . .

[DOM's Counsel]:         [Y]ou're aware that Medicaid took all of its auditing functions in-house in 2005, right?

[Strohm]:                Yes, ma'am.

[DOM's Counsel]:         So any audits that you did would have been prior to 2005?

[Strohm]:                I don't remember. Yeah, probably.

[DOM's Counsel]:         So when you're talking about having done some audits with Medicaid, we're talking about many, many years ago, right?

[Strohm]:                Right.

20

| | |
|---|---|
| [DOM's Counsel]: | And it would have been a State Plan that is not the State Plan we're talking about today? |
| [Strohm]: | It's pretty much the same thing. |

. . . .

| | |
|---|---|
| [DOM's Counsel]: | It's not the same State Plan that we're talking about today? It's not the 2015 State Plan, is it? |
| [Strohm]: | No. |
| [DOM's Counsel]: | [Y]ou understand that what Medicaid has to do under CMS rules is follow the State Plan that we do have, right? |
| [Strohm]: | And the State Plan you do have calls for prospective payment, which you are now trying to apply a cost reimbursement system to, which means it does not really fit. |
| [DOM's Counsel]: | My question was: You understand that we have to follow the State Plan that we have? |
| [Strohm]: | The State Plan you have states you use the Medicare rules when there's nothing else in the Medicaid to change it. And there is. The Medicare rules are based on reimbursement. The State Plan is based on a future payment. . . . If you're talking about reimbursement, then there's a difference. Because when you talk reimbursement . . . it means you're paying somebody for the specific things they did. But we're not. |

. . . .

| | |
|---|---|
| [DOM's Counsel]: | Let's look at [Attachment 4.19-D, Chapter 2, Section 2-1 of the State Plan]. "Allowable costs are based on CMS PRM 15-1 standards except as otherwise described in this plan." Do you agree it says that? |

21

| | |
|---|---|
| [Strohm]: | I think it does. I read it. Yes. |
| [DOM's Counsel]: | And allowable costs are . . . reimbursable costs, aren't they? |
| [Strohm]: | Yeah, for that period. |
| [DOM's Counsel]: | And so [the PRM] describes what are allowable costs? |

. . . .

| | |
|---|---|
| [Strohm]: | Yes. |

 . . . .

| | |
|---|---|
| [DOM's Counsel]: | And that's what Medicaid says you adopt. |
| [Strohm]: | No. They didn't say you adopted that. They said unless Medicaid said otherwise. And Medicaid said otherwise for 19 to 25 years.[9] |

. . . .

| | |
|---|---|
| [DOM's Counsel]: | Medicaid can only act through the State Plan. You would agree with me? |
| [Strohm]: | No. I wouldn't. I've seen [DOM] do too many other things. |

¶21. "[A]n agency must either conform to its prior norms and decision or explain the reason for its departure from such precedent." ***Methodist Specialty Care Ctr. v. Miss. Div. of Medicaid***, 305 So. 3d 1088, 1098 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting ***Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of***

---

[9] Under Attachment 4.19-D, Chapter 2, Section 2-1 of the State Plan, "[i]n cases where Division of Medicaid cost reporting rules conflict with . . . PRM 15-1, Division of Medicaid rules take precedence for Medicaid provider cost reporting purposes."

22

*Medicaid*, 21 So. 3d 600, 609 (Miss. 2009), *abrogated on other grounds by **King v. Miss. Mil. Dep't***, 245 So. 3d 404, 408 (Miss. 2018)).  DOM offered two explanations for the reversal of its long-standing treatment of the dividends: (1) DOM did not have an internal policy and (2) DOM was simply correcting a mistake.  DOM's explanations were offered through its sole witness at the administrative hearing, Manuel Pilgrim, who is DOM's *current* director of financial and performance review.

### 1.    Internal Policy

¶22.    When asked about Collier's testimony regarding an internal policy, Pilgrim testified that DOM did not operate that way, that "[e]verything has to be in writing."  But Pilgrim was not employed by DOM until September 2015, and he did not ask about or discuss with anyone at DOM DOM's prior treatment of the dividends.  Thus, Pilgrim has no first-hand experience or knowledge about DOM's long-standing treatment of the dividends.  His testimony was simply that an internal policy, "if it's not actually put into policy, . . . can't override what is written policy."

¶23.    But while that sounds good in theory, the substantial evidence and testimony reflects that for more than twenty years, DOM followed an unwritten internal policy not to offset the dividends. *Indeed, for more than two decades, year after year, DOM treated this issue the same way, regardless of what was written.*  Consequently, DOM cannot continue to argue, as it typically does, that only written policy applies.

¶24.    DOM refers to Collier as a "rogue employee."  But as Collier testified, DOM's internal policy not to offset the dividends continued years after her employment ended with

DOM. In fact, every other witness other than Pilgrim testified that DOM's internal policy not to offset the dividends continued for more than twenty years. As Strohm stated, "I was aware that [DOM] didn't want us to offset them, that [DOM] told us we shouldn't offset it."

¶25. Despite DOM's assertion that no internal policy existed or, alternatively, that such an unwritten internal policy has never been a policy of DOM, the substantial evidence and testimony reflect otherwise. DOM's denial of an internal policy contradicts the testimony of *multiple* witnesses at the administrative hearing who were all involved with DOM in some capacity at the time the 2015 cost reports were submitted as well as the preceding years. DOM's denial of the internal policy was offered and supported by the testimony of *one* current employee, Pilgrim, who has no personal knowledge of DOM's policy decisions before 2015. But while Pilgrim may have been unaware of DOM's historical treatment and policy on the issue, DOM as an agency cannot feign ignorance of its own internal practices, and substantial evidence supports that DOM made intentional policy decisions not to offset the dividends as far back as 1991. DOM's current position that it did not know of its own policy or that the policy is inapplicable is not an acceptable explanation to allow DOM to abruptly and without notice implement such a significant policy change. Indeed, as Collier stated, although the internal policy was not written in the State Plan,

> [DOM] did a desk review of every cost report that came in.
>
> And one thing that [it] specifically looked at was miscellaneous income. And we would put on there it was a refund for a prior year, no offset required. We spelled it out, and it was never adjusted.
>
> . . . .

But Medicaid for years did desk reviews, and [it] did not offset it[,] [s]o that to me is a way that [DOM] [is] publishing [its] policy that this is the way it is supposed to be done.

### 2. *Mistake*

¶26. DOM claims it failed to require the offset because it mistakenly failed to catch that the Providers were not following the State Plan. DOM maintains that it discovered that the Providers were not offsetting the dividends against current costs and that it adjusted the cost reports accordingly.

¶27. At the administrative hearing, Pilgrim testified that DOM's decision to offset the dividends was "not reversal of a policy" but was instead "an identification of something that hasn't been being noticed." He explained that "[t]he standards were there[,] [t]hey were just overlooked and not applied" by DOM.

¶28. When asked how this happened, Pilgrim suggested that DOM had no knowledge of what MHCA-SIF, CULIC, and LTCEIC were when the Providers reported the dividends as other income, stating, "because there's only acronyms there, unless [DOM] had knowledge of what those insurance companies were, [DOM] would not have known that those were insurance companies." The testimony continued:

| | |
|---|---|
| [Providers' Counsel]: | So, assuming that there was no more than one dividend a year, that would be 26 years? |
| [Pilgrim]: | Yes, sir. |
| [Providers' Counsel]: | Okay, So your testimony is that up to 105 long-term care facilities in Mississippi reported income from MHCA-SIF for 26 uninterrupted years, yet Medicaid did not know what MHCA-SIF was? |

| | |
|---|---|
| [Pilgrim]: | Yes, sir, that's what I'm saying. |
| [Providers' Counsel]: | And that would be hundreds of cost reports filed? |
| [Pilgrim]: | That is correct. |
| [Providers' Counsel]: | Okay. And in that time no one had said, "What is MHCA-SIF? What is this other income?" |
| [Pilgrim]: | No, sir. |
| [Providers' Counsel]: | Not in an audit or desk review? |
| [Pilgrim]: | Not that I'm aware of. |
| [Providers' Counsel]: | Okay. But you don't personally know whether anyone at Medicaid was aware of what MHCA-SIF was? |
| [Pilgrim]: | No, sir, I'm not. |
| . . . . | |
| [Providers' Counsel]: | I'm having trouble with your description of how this happened. What I'm hearing you say is that Medicaid was unaware, as far as you know, of what MHCA-SIF was, what CULIC was, what LTCEIC was and did not know that these dividends were being paid until sometime in 2018 and suddenly said, "Oh, gosh, look at this. They've been paying millions of dollars to hundreds of homes, and we haven't even known it, so we're going to start making them offset that." And that's your story, and you're sticking to that? |
| [Pilgrim]: | Absolutely. |

¶29.   In support of its position that it was simply correcting a mistake in its previous years-long handling of the dividends, DOM relies on *Mississippi Methodist Hospital &*

*Rehabilitation Center*, 319 So. 3d 1049. There, DOM "noticed that some nursing facilities had been including an allocation of the hospital assessment in their cost reports." *Id.* at 1052. DOM "identified this as incorrect and began adjusting nursing-home cost reports accordingly." *Id.* at 1052-53. On appeal, the nursing facility argued "that the DOM allowed the inclusion of a portion of the hospital assessment on [the nursing facility]'s cost reports for several years and improperly changed its interpretation of the State Plan to disallow a portion of the hospital assessment as a cost without notice." *Id.* at 1058. In response, DOM argued that "[a]ny unintentional failure by DOM to recognize the assessment on [the nursing facility]'s [c]ost [r]eports in years prior does not change the text of the State Plan." *Id.* (first alteration in original). The Court found:

> While [the nursing facility] asserts that it included Methodist's hospital assessment as an allowable cost in its Medicaid cost report in previous years without incident, *it does not offer any evidence that allowing a hospital assessment on a nursing-facility cost report was an affirmative "norm" or "decision" by the DOM*. Indeed, testimony by DOM employees indicated that the DOM simply did not notice that some hospital-based nursing facilities were including the hospital assessment as a cost because the allocation was lumped into a calculation that included several costs, and determining that the hospital assessment was included in that number took several calculations.

*Id.* (emphasis added). The Court concluded that "DOM explained its reasoning for disallowing the hospital assessment as an allowable costs" and "agencies may correct mistakes of law, even when a party relied to its detriment on the mistake." *Id.* at 1058-59.

¶30. We find DOM's reliance on *Mississippi Methodist Hospital & Rehabilitation Center* is misplaced because that case is distinguishable. Here, unlike in *Mississippi Methodist Hospital & Rehabilitation Center*, the Providers offered evidence that DOM's internal

27

policy not to offset the dividends was an affirmative "norm" or "decision" by DOM. *Id.* at 1058 (internal quotation marks omitted). Indeed, the majority of the witnesses at the administrative hearing acknowledged that for more than twenty years, DOM did not offset the dividends. Specifically, Collier testified that "[DOM] did a desk review of every cost report that came in . . . [a]nd we would put on there . . . no offset required[;] [w]e spelled it out, and it was never adjusted." Worrel, Lebreton, and Strohm all testified that from 1993 to 2018, they did not offset the dividends. Worrel explained that at no time during that twenty-five year period did DOM ever raise it as an issue. And Strohm, who was accepted as an expert in Medicaid policy, procedure, and reimbursement, testified that he was "aware" that DOM did not want to offset the dividends.

¶31. Additionally, in *Mississippi Methodist Hospital & Rehabilitation Center*, the testimony indicated that DOM did not notice the inclusion of the assessment "because the allocation was lumped into a calculation that included several costs[.]" *Id.* Here, although DOM suggested that it did not know that MHCA-SIF, CULIC, and LTCEIC were insurance companies because of their acronyms, testimony from multiple witnesses at the administrative hearing indicated that DOM knew the Providers received income from these insurance companies and made the conscious decision not to offset the same.

¶32. DOM's mistake argument would require one to believe that DOM failed to notice income from these insurers for approximately 105 nursing facilities in annual cost reports filed over a twenty-five year period and never questioned what this income resulted from for multiple Providers. This mistake included thousands of cost reports in which DOM claims

28

it did not notice the income or did not understand where it came from.

¶33.    Testimony by multiple witnesses established that DOM made a policy decision not to offset the dividends at issue, approved two decades of cost reports without requiring offsets, and trained its auditors and DOM providers not to offset the dividends at issue.  Even assuming DOM made a mistake, such mistake became the norm, as DOM's action not to offset the dividends was done year after year for more than two decades.  DOM's position that it corrected a mistake is not an acceptable explanation to allow DOM to abruptly and without notice implement such a significant policy change.

¶34.    For approximately twenty-five years, DOM did not require the dividends to be offset against current costs.  Then, without notice, DOM adjusted cost reports to offset the dividends against current year costs.  DOM's decision to offset the dividends after decades of not offsetting the same payments was arbitrary and capricious and done without a reasonable explanation.  Despite DOM's position, this is not a situation in which DOM discovered or identified "something that hasn't been being noticed."  Instead, as the Providers note, the record reflects that "DOM changed course after decades of reliance by the Providers on DOM's representations because DOM's current leadership wanted to do things a different way without any consideration of DOM's prior practices and policy—that is the definition of arbitrary and capricious."  As a result, DOM's decision should be reversed.[10]

_____

[10] The dissent asserts that "[n]o change in policy has occurred; DOM simply fixed a previous oversight regarding how to account for this insurance income. DOM followed the written policy stated in the State Plan and the PRM as required of it by law[.]"  Diss. Op. ¶ 68.  But as the record reflects, for more than twenty years, DOM did *not* follow the written

## II. DOM failed to provide public notice of the significant change in policy.

¶35. Under 42 C.F.R. § 447.205(a) (West, Westlaw through Nov. 6, 2025), "the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services." It is undisputed that public notice was not provided for DOM's reversal of the internal policy at issue. DOM suggested at the administrative hearing that only formal changes to the State Plan require public notice under 42 C.F.R. § 447.205(a). But the regulation does not limit notice to "only formal changes to the State Plan" but, instead, mandates "public notice of *any significant proposed change in its methods and standards for setting payment rates for services*." *Id.* And as the Providers note, "[v]irtually all witnesses testifying at the administrative hearing, other than . . . Pilgrim, believed DOM's change in policy related to the offsets was a significant change requiring notice." Indeed, this change implemented by DOM results in significant changes to the Providers' reimbursement rates. As Strohm explained, "If we don't know the rules, we're just at the mercy of anybody to make a decision."

¶36. DOM asserts notice is not required when "change is being made to conform to Medicare methods or levels of reimbursement[.]" 42 C.F.R. § 447.205(b)(1) (West, Westlaw through Nov. 6, 2025). It argues that it made the change at issue in order to conform to DOM's existing standards. But what DOM fails to recognize is that its long-standing treatment of the dividends set the standard. Regardless of any written policy, DOM's twenty-

---

policy in the State Plan and the PRM as required by law. Instead, for more than two decades, DOM followed an unwritten policy not to offset the dividends or income. DOM's action not to offset the dividends year after year for over two decades can hardly be called an "oversight."

30

plus year internal policy not to offset the dividends became the standard. Even if DOM was correcting a mistake, it was a *mistake consistently and consecutively made for more than two decades*, which, once discovered, was significant to warrant public notice before making any changes. Any change to DOM's long-standing internal policy warranted public notice under 42 C.F.R. § 447.205(a).

¶37. As was shown at the administrative hearing, DOM's change in its long-standing internal policy was significant enough to warrant public notice under 42 C.F.R. § 447.205(a). Absent such public notice, long-term-care providers would have no notice to begin accounting differently to comply with DOM's changes.[11]

## CONCLUSION

¶38. Substantial evidence shows that for more than two decades, DOM had an internal policy not to offset the dividends received by the Providers from MHCA-SIF, CULIC, and LTCEIC.[12] DOM's significant change in that long-standing policy was arbitrary and

---

[11] The dissent asserts that we fail to "articulate specifically what this alleged unwritten policy is and how DOM should give notice that an amorphous, unwritten, unstated alleged practice is changing." Diss. Op. ¶ 62. But we did not create this situation. It is not the Court's policy to articulate. It is a policy that DOM followed year after year for more than twenty years, with numerous desk reviews finding no error. The fact that DOM followed an "amorphous, unwritten, unstated" policy rests solely on DOM. The only issue before the Court is whether DOM's actions were arbitrary and capricious, and we find that they were. The policy has been discussed at length. And we are not obligated to articulate *how* DOM should provide notice of its change in policy; we simply find that notice must be provided. 42 C.F.R. § 447.205(a).

[12] The dissent asserts we are "flipping" the burden of proof to DOM. Diss. Op. ¶ 40. We are not. The Providers have "the burden of proving that DOM's decision was wrong." Diss. Op. ¶ 40. The Providers met this burden. The Providers have shown that DOM's actions in following an unwritten policy for more than two decades and then abruptly changing that policy without sufficient reason or notice was arbitrary and capricious.

capricious and warranted notice under 42 C.F.R. § 447.205(a). Accordingly, the decisions of the DOM and the chancellor are reversed, and judgment is rendered in favor of the Providers.[13]

¶39. **REVERSED AND RENDERED.**

**RANDOLPH, C.J., MAXWELL, CHAMBERLIN, ISHEE, SULLIVAN AND BRANNING, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶40. It is axiomatic in our caselaw that the party making a claim or allegation has the burden of proving that claim; in other words, the responsibility of the burden of proof lies with the party making the allegations. In cases involving DOM, a party has the burden of proving that DOM's decision was wrong. In this case, Hattiesburg Medical Park Management et al. (collectively, "the Providers") allege that DOM was wrong because it had an unwritten policy that the Providers followed. Thus, the Providers must prove the existence of a DOM policy that they were following. But the Providers wholly failed to prove that such a policy existed. This failure is made glaringly obvious by the fact that neither the Providers nor the majority can in any way articulate the alleged policy that the Providers supposedly followed (also begging the question of how did they follow something that they cannot articulate?). The Providers produced absolutely no evidence that the

---

[13] Having found that DOM's actions were arbitrary and capricious and that public notice was required for any proposed changes to the internal policy, we do not address the remaining issues raised by the Providers. Moreover, to be clear, we do not address or consider whether the adjustment or offset itself was proper. We simply find that an internal policy was in place and that public notice under 42 C.F.R. § 447.205(a) must be provided before any changes in that policy can be made.

Providers or any of their employees knew of any alleged DOM policy not to offset insurance rebates. The Providers offered no written evidence of any such policy. The majority attempts to distract from the Providers' duty to meet the burden of proving the policy by flipping the burden of proving the policy to DOM, arguing that DOM must articulate what its alleged unknown, unproved policy was. Such a change in who carries the burden of proof is unprecedented. Today, this Court legislates from the bench, overrules years of precedent by implication, and tells Mississippi taxpayers that they must foot the bill for the Providers' utter failure to follow the explicit dictates of the Mississippi State Medicaid Plan (State Plan), as well as for the Providers' obfuscation of their failure to follow the State Plan. Accordingly, I dissent.

¶41. The structure and relationships between insurer and insured are important to describe in this case in order to ascertain which rules and regulations apply to the insurance rebates. The Mississippi Health Care Insurance Services Corporation (MHCISC) is a closely held, nursing-home-owned company that provides insurance products to nursing homes, and it created all three of the insurance companies at issue here. Mississippi Health Care Association Self-Insurers' Fund (MHCASIF) is a self-insurance company formed in 1990 by Mississippi long-term-care providers to provide workers' compensation coverage. All of the Providers are insured by MHCASIF and pay premiums to it. They also had to pay a one-time, minimal security deposit to join MHCASIF. Caregivers United Liability Insurance Company (CULIC) was created in 2003 and provides professional and general liability insurance. The insured must both purchase shares in CULIC and pay premiums to receive

33

insurance from CULIC. Long Term Care Employers Insurance Company (LTCEIC) provides excess coverage to MHCASIF and CULIC, and those two companies are its only insureds. The Providers claim that they do not directly pay LTCEIC for insurance coverage, but five of the Providers allege that they are shareholders in LTCEIC.

¶42. All three insurance companies pay all or some of the Providers what the Providers term dividends and what DOM terms rebates. MHCASIF distributes surplus premiums to members with low workers' compensation loss ratios. This money is paid on a prorated basis, accounting for each member's premiums paid and claims for that year. MHCASIF calls these distributions "dividends." CULIC also pays its members for unused premiums and the income earned thereon, and the payments cover more than one year. CULIC also calls these payments "dividends." In the case of CULIC, as mentioned, the insureds state that they are also shareholders. LTCEIC pays dividends to its shareholders. Five of the Providers allege they are shareholders and received a total of $7,369 in LTCEIC dividends in 2015. The premiums paid to LTCEIC by MHCASIF and CULIC are reflected in the insurance premiums that those insurance companies charge their insureds, including the Providers. For years, the Providers listed this money as "other income" on their cost report, using merely the companies' acronyms without describing the company distributing the income or describing the income itself, and not using it to offset the cost of insurance.

¶43. In 2016, one of the Providers, Bedford Care Center of Mendenhall, filed its 2015 cost report with DOM. The DOM desk review failed to flag the "other income," as the attribution did not indicate that the other income was related to insurance. Subsequently, around 2018-

19, DOM began an audit of the 2015 cost report. During the audit, DOM requested documents to corroborate portions of the cost report, and subsequently discovered that the other income listed was income from companies that insured the Providers. The Providers never gave DOM the requested corroboration, and DOM ultimately ruled against the Providers and found that the income must offset insurance costs.

¶44. At the later administrative hearing on the issue, the Providers argued that DOM had an unwritten internal policy not to offset the insurance income, and that it should be held to that; or, if the policy had been changed, notice was required. It also argued that the income consisted of investor dividends, not insurance rebates. Further, it argued that offsetting income from multiple years in one year is poor policy for a prospective reimbursement system like Mississippi's and does not support the goals of the State Plan. The Providers additionally argued that the income from LTCEIC and CULIC were stock dividends, not premium refunds, and that the MHCASIF income is a return in investment earnings that only well-performing insureds receive. DOM argued that the State Plan applies, and it requires that the income, whether termed a dividend or a rebate, offsets insurance costs.

¶45. Manuel Pilgrim, DOM Director of Financial and Performance Review Department, which includes the unit that performs cost audits on nursing facilities, testified. He testified that the income listed on the Providers' cost reports was simply attributed to acronyms without a description, so DOM did not know to what the income was attributable. Upon audit, DOM discovered that these were moneys paid by insurance companies. DOM reviewed the rules for how to account for this money, and determined it needed to offset

insurance costs, making adjustments to the cost reports during the audit. Pilgrim testified that the State Plan has never provided a policy that insurance income did not need to be offset, noting that this was "not reversal of a policy. It is an identification of something that hasn't been being noticed." He further testified that it has always been DOM's policy to offset income such as this; the income just was not understood by DOM for a long while as the type of income that should be offset because the Providers failed to adequately identify it.

¶46. Jamie Collier, who worked for DOM from 1983 to 2001, testified on behalf of the Providers. She was the director of reimbursement at DOM from the early 1990s until 2001. She then went to work in private practice preparing cost reports for nursing home companies, among other things. She testified that her staff at DOM noticed the MHCASIF insurance income and "we made the decision that it should not be offset . . . ." Because that income was only received by facilities that had good workers' compensation records, she stated that DOM did not want to offset it and "reward the facilities who had a bad experience rating and did not get a refund." She further stated that it became "*like* an *internal* policy" and that she "regret[s] that we didn't put it in the State Plan or in the cost report instructions." (Emphasis added.) Collier also asserted that income that was not for that particular year was not offset. She further stated she did not remember if this information was in DOM's cost report training.

¶47. Harry Strohm, a CPA who testified for the Providers, stated that he had performed audits for DOM ten or fifteen years ago. Regarding the insurance income, he stated that one

36

of the companies he audited told him that DOM told the company that it did not have to offset the income. He further testified, "I was aware that they didn't want us to offset them, that they told us that you shouldn't offset them." When asked to clarify that DOM told him not to offset the insurance income, he said, "When you go and do an audit for DOM, they tell you what they want you to do. And that was one of the things. They just – you know, we're talking about 10 or 15 years ago. I mean, it's been a long time. I've done it." On cross-examination, he admitted that he was aware that DOM changed all its auditing to in-house in 2005, so any audit he would have performed would have been before 2005, or at least eighteen years before the 2022 hearing.

¶48. Stephen Worrel, the Providers' CFO, testified that he prepared the cost reports for the Providers, and that he did not offset the insurance rebates. He testified that DOM never corrected him. But more importantly, he never testified that DOM told him not to offset the rebates or that he thought DOM had a policy not to do so—he testified that he accounted for the income that way because the rebates represented multiple years, and it made sense to him as an accountant not to offset them because Mississippi has a prospective payment system. And he also noted simply that DOM did not correct him. He made no statements of any kind that DOM or any of its policies had anything to do with his decision not to offset the insurance rebates.

¶49. The hearing officer recommended upholding DOM's decision to offset the insurance income. First, he determined that the income amounted to rebates, not dividends, because the payments resulted in a reduction of insurance costs. He noted that "the Providers failed

37

to give DOM any documents to support its argument that the Insurance Dividends were returns on investments." "DOM asked the Providers for information on their investments-stock certificates, IRA 1099-DIV or 1099-INT forms, etc. The Providers, however, never provided DOM with any documents related to their investments." Further, "[t]he Providers also failed to offer any evidence at the Hearing to support this position." The hearing officer then determined that the alleged internal policy to not offset insurance income did not exist because DOM speaks only through the State Plan and the Administrative Code. He found that by offsetting the insurance income, DOM was simply following the State Plan and correcting a prior mistake. Further, he found that the Providers were already on notice that DOM would follow the State Plan, so additional notice was not required. The hearing officer found that equitable estoppel did not apply because the Providers did not demonstrate a change of position or prejudice, and they also did not demonstrate a legally cognizable property interest because they had no right to continue being overpaid by taxpayer dollars. DOM affirmed and adopted these findings.

¶50. The Providers appealed to the Hinds County Chancery Court. The chancery court affirmed DOM's final decision. The court found that the rules required the Providers to offset the insurance income. The court also noted that notice was not required because DOM was simply complying with its relevant rules. It further found that equitable estoppel did not apply.

¶51. The Providers appeal, arguing: 1) DOM's action offsetting the insurance income was arbitrary and capricious, 2) DOM is equitably estopped from reversing its longstanding

policy, 3) the LTCEIC offsets are particularly unfounded, and 4) DOM must provide public notice for its reversal of policy.

## 1. Standard of Review

¶52. The majority notably avoids mentioning one major aspect of the standard of review: that the party challenging DOM's decision has the burden of proof to show that the agency's decision should be reversed. *Methodist Specialty Care Ctr. v. Miss. Div. of Medicaid*, 305 So. 3d 1088, 1096 (Miss. 2020). The majority attempts to reframe one of the primary issues by failing to look at it first through the lens of the Provider's burden of proof. Notwithstanding this burden of proof, and notwithstanding DOM's request for corroborating evidence, the Providers utterly failed to provide any proof that these even are dividends instead of rebates.

## 2. Applicable Rules and Regulations

¶53. The State Plan provides that "[a]llowable costs are based on CMS PRM 15-1 standards except as otherwise described in this plan." State Plan 4.19-D, ch. 2, § 2-1. Thus, if the State Plan does not address a cost, the Provider Reimbursement Manual (PRM) produced by the Centers for Medicare & Medicaid Services (CMS), specifically PRM 15-1 standards, apply. *Id.* The State Plan does not address how to account for these insurance dividends or rebates; thus, pursuant to the plain language of the State Plan, PRM standards apply to this income.

¶54. PRM 2162 provides that costs incurred for various insurance are allowable. PRM 2162. This includes premiums paid to captive insurance companies. PRM 2162.2. CULIC

39

and LTCEIC are both captive insurance companies. As for income returned to the insured from the insurer captive insurance company, "[a]ny funds returned to the insured by the insurer (rebates, distributions, etc.) must be offset against the costs in the year you receive them." PRM 2162.2. Of note is that this income offsets costs in the year the income is *received*, with no mention of the year to which the refund may apply; only the year received is relevant.

¶55. Additionally, if a provider is related to such an insurer "through ownership or control," "[t]he excess of actuarially determined loss reserves and related operating expenses over actual losses and related operating expenses and gains and losses from investments must be taken into account in establishing reasonable premium levels which do not reflect a profit factor." PRM 2162.2. This rule further shows the intent of the accounting methods that insurance income should, in one way or another, reduce insurance costs, rather than be an unfettered boon to the insured at the expense of the taxpayers.

¶56. Premiums paid to self-insurance programs are allowable costs if the conditions of Section 2162.7 are met. PRM 2162.3. MHCASIF is a self-insurance fund. One of the conditions is that "[a]ny rebates, dividends, etc., to the provider from the fund will be used to reduce allowable cost." PRM 2162.7(B)(3). Thus, to be able to categorize the premiums paid to MHCASIF as allowable costs on their cost reports, the Providers must, as stated explicitly, use any payments, including rebates and dividends, to reduce the allowable cost.

¶57. PRM Chapter 8 reaffirms these principles. The principle of Chapter 8 is that "[p]urchase discounts, allowances, and refunds are reductions of the cost of whatever was

40

purchased. Similarly, refunds of previous expense payments are reductions of the related expense." PRM 15-1, ch. 8, § 800. "Discounts, allowances, refunds, and rebates are not to be considered a form of income but rather a reduction of the specific costs to which they apply in the accounting period in which the purchase occurs." PRM 15-1, ch. 8, § 804. The PRM also accounts for refunds that are received in a different year than the cost incurred, requiring that "*where possible* an accrual in the initial period should be made of the amount if it is significant and cost correspondingly reduced. However, if this cannot be readily accomplished, the amounts reduce comparable expenses *in the period in which they are received.*" *Id.* (emphasis added).

### 3.    *Arbitrary and Capricious*

¶58.    The Providers argue that DOM had an internal policy that provided that this income would not offset allowable costs, and that it suddenly, after decades and with no notice, reversed its stance. The Providers maintain that this action is arbitrary and capricious for its departure from DOM precedent. DOM maintains that it never had a policy, and that it was fixing a mistake it overlooked in order to comply with the State Plan. It argues that the Providers were on notice through the State Plan and PRM as to how this income must be treated. The Providers also argue that this is arbitrary and capricious because offsetting income that accounts for multiple years against one year's costs is inconsistent with Mississippi's prospective payment system. DOM counters that this is a policy argument that is more appropriately addressed by a proposed change in the rules. The Providers provide no evidence that DOM actually told the Providers themselves not to offset this income, they

41

merely rely on the generalized notion that DOM had an unwritten policy of which it informed unidentified and unknown providers, not that DOM told these Providers themselves of this policy.

¶59. DOM is legally bound to follow the State Plan and may not deviate from it. ***Miss. Div. of Medicaid v. Windsor Place Nursing Ctr., Inc.***, 296 So. 3d 68, 72 (Miss. 2020). The State Plan does not speak on this issue, so the State Plan mandates that the PRM standards apply. The PRM clearly requires income returned from insurer to insured, no matter how it is termed, to offset costs. The Providers argue that DOM had an unwritten internal policy to not offset this income. They rely primarily on the testimony of Collier, who left DOM in 2001, and who admitted in her testimony that this alleged internal policy was never included in the State Plan. The Providers did not produce any written evidence of a policy—no minutes of one alleged meeting in which this internal policy may have been recorded according to Collier, no documents from cost report preparers training conducted by DOM, simply no corroborating evidence. Moreover, the evidence about whether DOM informed these particular Providers of this alleged unwritten internal policy does not exist.

¶60. Pilgrim testified that he was unaware of such an alleged unwritten policy when he started at DOM in 2015. The Providers maintain that Pilgrim was at fault because he "did not ask anyone at DOM about DOM's treatment of this issue." But DOM follows the State Plan, which points to the PRM on this issue, and the PRM provisions are clear. And as DOM points out, "[i]f an employee had to do as the Nursing Facilities suggest and ask other employees if there are any unwritten policies that are contradictory to the State Plan before

making a decision, the agency would halt and cease to function efficiently." Indeed, the fact that the Providers attempt to put the onus on a director to seek out information on whether DOM is violating their own rules and regulations (without any evidence that this is occuring), instead of assuming that the policy is what is in the State Plan as is required by law, undermines the Providers' argument that a true policy existed.

¶61. The Providers have the burden of proof, and they have not met that to show that a DOM policy existed that allowed the Providers not to offset the income. Indeed, the written policy in place in the State Plan and PRM, of which the Providers had constructive notice, was that insurance income must offset allowable costs. DOM speaks through the State Plan, not through amorphous, vague oral statements by employees. Even if the Providers could show that DOM's failure to recognize where the income was coming from was a "norm" or a "decision" by DOM, DOM explained the reason for its departure—it was applying the plain language of the State Plan and the PRM as it was required by law to do. As this Court has noted before, when DOM fails to catch mistaken accounting in cost reports, it is not arbitrary and capricious for DOM to correct the mistake once it becomes aware. *Miss. Methodist Hosp. & Rehab. Ctr. v. Miss. Div. of Medicaid*, 319 So. 3d 1049, 1059 (Miss. 2021). "[A]gencies may correct mistakes of law, even when a party relied to its detriment on the mistake." *Id.* "No where in the controlling statutes, the state plan, or Medicaid's policy do we see language that lends itself to a construction taken by the providers" that insurance income does not offset insurance costs. *Windsor Place Nursing Ctr.*, 296 So. 3d at 74. "While the DOM may have failed to catch this in the past, [insurance income must offset

43

allowable insurance costs]. And any action taken to the contrary by Medicaid is a violation of its rules and regulations." *Id.* The majority today holds that DOM's failure to correct a cost report creates a policy, and appears to overrule this entire line of caselaw to some extent.

¶62. The Providers' argument that this method of using income from multiple years to offset costs in one year is inconsistent with Mississippi's prospective payment system is a policy argument against applying the rules, and this Court need not consider it because this Court and DOM are bound to apply the rules. And the PRM explicitly allows the income to offset costs in the year in which the income is received; the offset need not occur in the year to which it is applicable. The majority finds differently, yet it does not articulate specifically what this alleged unwritten policy is and how DOM should give notice that an amorphous, unwritten, unstated alleged practice is changing. What is the exact policy? What income precisely, exactly, and completely did DOM have a policy not to offset? Indeed, the Providers' witnesses testified differently. Collier testified only that DOM had an unwritten "policy" as to MHCASIF, as the other two companies did not exist while she was at DOM. Strohm testified that DOM had an unwritten "policy" as to all three companies that he learned of while he performed audits for DOM, despite the fact that LTCEIC was not in existence when Strohm performed audits for DOM, so he could not have been told of such a policy as relates to LTCEIC.[14] So, what policy exactly existed, and what policy must DOM give notice that it changed, when the Providers' witnesses cannot even agree on what such a "policy" was? The fact that none of this is articulated and that the Providers did not prove

---

[14]DOM converted audits to internal auditors only in 2005, making 2004 the last year external contractors would have worked for DOM. LTCEIC was formed in 2005.

44

any specifics is telling as to the existence of a "policy." The majority creates an impractical, unworkable rule for administrative agencies with this holding.

### 4. Equitable Estoppel

¶63. "An estoppel claim requires: '(1) Belief and reliance on some representation; (2) Change of position, as a result thereof; (3) Detriment or prejudice caused by the change of position.'" *Miss. Div. of Medicaid v. Yalobusha Cnty. Nursing Home*, 346 So. 3d 413, 426 (Miss. 2022) (quoting *Suggs v. Town of Caledonia*, 470 So. 2d 1055, 1057 (Miss. 1985)). The plain language of the PRM, to which the State Plan points the Providers, requires insurance income to offset insurance costs, so the Providers "had no justification to rely on" not offsetting costs. *Miss. Methodist Hosp. & Rehab. Ctr.*, 319 So. 3d at 1058. Moreover, the Providers "cannot claim that the DOM is estopped from acting under the dictates of the Plan, just as [the Providers] knew it would." *Cent. Miss. Med. Ctr. v. Miss. Div. of Medicaid*, 294 So. 3d 1121, 1129 (Miss. 2020), *overruled on other grounds by Miss. Methodist Hosp. & Rehab Ctr.*, 319 So. 3d 1049. Furthermore, the Providers do not claim that DOM made any representation to them; they merely bring in former employees and contractors of DOM to testify that DOM had some amorphous, unwritten policy. No evidence and no testimony links this unwritten policy to the Providers' being told about it by DOM.

### 5. LTCEIC Dividends

¶64. The Providers argue that using the LTCEIC dividends to offset insurance costs is particularly egregious because they are merely stockholders and do not pay a premium to

LTCEIC to offset. DOM requested stockholder and dividend documents from the Providers to support their claim that they were merely investors, and the Providers completely failed to provide any of the requested information. As the hearing officer noted, the Providers have the burden of proof, and they provided none of the documentation DOM requested to support their claims. Thus, the Providers did not meet the burden of proof that DOM erred in its treatment of this income.

¶65. In any event, the PRM requires extra insurance income to reduce premiums first. Instead of reducing premiums for MHCASIF and CULIC, LTCEIC allegedly gave dividends to the Providers, who pay premiums to MHCASIF and CULIC. And the testimony provided that the premiums that MHCASIF and CULIC charge the Providers reflect the cost of the premiums they themselves pay to LTCEIC. Thus, the end result is that the Providers receive dividends from LTCEIC at the expense of reducing the cost of their MHCASIF and CULIC premiums.

¶66. Given that the Providers utterly failed to meet their burden of proof on this issue, DOM did not act arbitrarily or capriciously by requiring the five relevant providers to offset less than $8000 between the five of them, instead of requiring the taxpayers of Mississippi to bear the burden of a cost for which the Providers paid more in premiums in order to receive income later in lieu of cost reduction of premiums at the outset.

6. *Notice*

¶67. The Providers argue that DOM was required to provide notice of this change under 42 C.F.R. § 447.205 (West, Westlaw through Nov. 6, 2025). DOM "must provide public

46

notice of any significant proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205(a) (West, Westlaw through Nov. 6, 2025). But DOM did not change its methods and standards here; it applied its published methods and standards. That it had previously mistakenly overlooked the Providers' noncompliance with the published, written standards does not plunge DOM into the category of having changed a method or standard. The majority is unable to articulate the specifics of precisely what policy is changing; instead, it requires DOM to figure out what amorphous, unwritten policy it must give notice of changing, despite the Providers' failure to meet the burden of proof showing any precise specifics.

¶68.    No change in policy has occurred; DOM simply fixed a previous oversight regarding how to account for this insurance income. DOM followed the written policy stated in the State Plan and the PRM as required of it by law, and of which the Providers had constructive notice. Thus, no error has occurred, and estoppel does not apply. I consequently dissent because we should affirm the decisions of both the chancery court and DOM.

**COLEMAN, P.J., JOINS THIS OPINION.**